1

2

3

4

5

6 **UNITED STATES DISTRICT COURT**

7 **DISTRICT OF NEVADA**

8 CARIM CRUZ,                                     Case No.: 2:21-cv-02118-GMN-DJA

9           Petitioner                       **Order Denying Petition, Denying**
                                            **Certificate of Appealability and**
10 v.                                             **Closing Case**

11 WILLIAM HUTCHING, *et al.*,[1]

12           Respondents.

13          In his 28 U.S.C. § 2254 First-Amended Habeas Corpus Petition, Carim Cruz

14 challenges his conviction by jury of Murder with Use of a Deadly Weapon and eight

15 other charges, including Attempted Murder and Assault and Battery with a Deadly

16 Weapon. (ECF No. 18.)  He alleges that his trial and appellate counsel rendered

17 ineffective assistance in numerous ways. (*Id*.) The court has considered the merits of

18 the petition, and it is denied.

19

20

21

22 [1] According to the state corrections department's inmate locator page, Cruz is incarcerated at
   Southern Desert Correctional Center. The department's website reflects Ronald Oliver is the
23 Warden for that facility.  At the end of this Order, the Court directs the Clerk to substitute Ronald
   Oliver for prior Respondent William Hutching, under, *inter alia*, Rule 25(d) of the Federal Rules
   of Civil Procedure.

I.      **Background**

In July 2016, a Nevada (Clark County) jury convicted Cruz of one count each of First-degree Murder with use of a Deadly Weapon and Battery with Use of a Deadly Weapon, two counts of Attempted Murder with use of a Deadly Weapon, four counts of Assault with a Deadly Weapon, and two counts of Discharge of a Firearm from or Within a Structure or Vehicle. (Exh. 61.)[2]  Cruz was convicted of firing into a crowd with a semi-automatic handgun from the driver's seat of his vehicle, killing one woman and injuring a second.  He was sentenced to an aggregate total sentence of 38 years to life. (Exh. 73.) The Nevada Supreme Court affirmed his convictions in September 2018, and the Nevada Court of Appeals affirmed the denial of his state postconviction Petition in November 2021. (Exhs. 105, 156.)

Cruz dispatched his federal Petition for mailing about November 18, 2021. (ECF No. 7.)  This Court granted Cruz's motion for appointment of counsel and Cruz filed an Amended Petition through his counsel, the Federal Public Defender. (ECF Nos. 6, 18.)

The Amended Petition sets forth eight grounds that trial and appellate counsel were ineffective in violation of Cruz's Fifth, Sixth, and Fourteenth Amendment rights. He alleges:

> Ground One: Trial counsel pursued the objectively unreasonable defense of misidentification. Counsel could have instead pointed to evidence that negated the deliberation element of First-degree Murder and/or established the elements of Voluntary Manslaughter.
>
> Ground Two: Trial counsel failed to conduct a pretrial investigation that would have uncovered prejudicial photographs and failed to object to the introduction of the photographs.

---

[2] Exhibits referenced in this Order are exhibits to Respondents' Motion to Dismiss, ECF No. 21, and are found at ECF Nos. 22-24, 26.

<u>Ground Three</u>: Trial counsel failed to properly object to Sherilyn Moreira's testimony that Cruz possessed a gun in a briefcase on some unknown date.

<u>Ground Four</u>: Trial counsel failed to object to bad act evidence offered by Eric Flores.

<u>Ground Five</u>: Trial counsel did not object to jury instruction no. 28.

<u>Ground Six</u>: Trial counsel was ineffective regarding the plea proceedings.

<u>Ground Seven</u>: The cumulative trial errors violated Cruz's Fifth, Sixth, and Fourteenth Amendment rights.

<u>Ground Eight</u>: Appellate counsel failed to argue that the trial court should have instructed the jury that the court would sentence Cruz on the deadly weapon enhancement.

(ECF No. 18 at 8-26.)

The Court denied Respondents' Motion to Dismiss, in part. (ECF No. 35.)  The Court deferred a determination as to whether grounds 1 and 6 are procedurally barred from federal review to this merits adjudication.  The remaining grounds are before the Court for consideration of the merits.  Respondents have now answered the petition, and Cruz replied. (ECF Nos. 36, 39.)

**II.    Legal Standards of Review**

    **a.  Antiterrorism and Effective Death Penalty Act ("AEDPA")**

28 U.S.C. § 2254(d), a provision of AEDPA, provides the legal standards for this Court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002).  This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413).  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.*  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.  Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

5

**b. Ineffective Assistance of Counsel ("IAC")**

IAC claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*.  To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.  A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*.  Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).  When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that

6

there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted).  Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84.  The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.  "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

### III.    Trial Testimony

The Court summarizes trial evidence and related state-court record material and proceedings as a backdrop to its consideration of the issues presented in the case.[3] The trial testimony reflected that Petitioner Carim Cruz, the victim Dena Serano, and many if not most of the eyewitnesses were all part of a close-knit Belizean community in Las Vegas.

Rasheda Lopez testified that she was a close family friend of the victim. (Exh. 51 at 50-147.)  Lopez and Cruz socialized with the same groups of people; she had spoken to him but did not know him well.  On the night in question, August 15-16, 2014, she went with a group to the Geisha House in Las Vegas, a restaurant that turns into a club at night.  She went with Sherilynn "Monique" Moreira to meet Lopez's boyfriend, Desmond Castillo, along with Felix Martinez, Richie Lambey, and Serano.  Lambey was Serano's

---

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record.  The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court.  Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Cruz's claims.

longtime boyfriend; they had two children.  At some point in the early hours of August 16, Lopez went outside of the club with Castillo and ran into Serano who was upset and crying.  She told Lopez that Cruz had punched her in the face.  Lopez said that Cruz and Lambey had argued over the years.  Castillo, Serano, Felix Martinez, Lambey, Lopez, and Keith Martinez walked toward a neighboring Famous Dave's restaurant parking lot where Felix Martinez's car was parked.  Lopez wanted them to all leave together.  Lambey did not want to leave; he was angry, "blabbering and yelling and screaming" about Serano getting hit.  The yelling was directed at Cruz, though Lopez did not know exactly where he was.  A few minutes later a dark car drove up slowly, perhaps a Mercedes or BMW.[4]  The driver's side window was down, and she saw Cruz driving.  She'd seen Cruz driving that vehicle before.  Cruz yelled repeatedly, "Y'all want to keep fucking with me." (*Id*. at 73.)  Cruz's car was about 18 feet from the group.  The lighting was pretty bright because they were right outside the restaurant.  The driver's side of the car was closest to the group; Cruz was driving and someone she knew as Eric was in the passenger seat.  Cruz was yelling towards them, and she heard Eric say "Don't do that shit. Don't do that shit right now." (*Id*. at 140.)  Cruz leaned out of the driver's side window, took a gun out, and started shooting.  Lopez said, "Oh shit, he do [sic] have a gun," and grabbed her boyfriend to the ground.  She tried to grab Serano, who pulled away from her, yelling, "Fuck that. It's on. It's on. He hit me." (*Id*. at 78.) Lopez heard three or four gunshots. She did not see Serano get hit, but she saw her fall

---

[4] Later in the trial a corporate investigator for Caesars Palace casino testified as custodian of records that Cruz was an employee and had a blue Mercedes Benz that was registered to him. (Exh. 55 at 205-212.)

to the ground.  Lopez called 911; she didn't approach Serano because she could see

that she was dead.  Castillo told Lopez she needed to sit down because she'd also

been shot.  Lopez had been struck in her right, upper back/shoulder area.  Before the

ambulance took her, she told police on the scene and then again at the hospital that the

shooter was Carim Cruz.  She had not seen anyone else at the scene who had a gun.

Lopez identified herself, Castillo, and Cruz on surveillance video.  The State played the

911 call and Lopez agreed that she told the 911 operator that "Carim shot Dena." (*Id*. at

96.)

Serano's boyfriend, Richie Lambey, testified that he had known Cruz for about ten

years before the shooting and knew Cruz's whole family. (Exh. 56 at 149-291.)  He and

Serano were at the club that night; when they went outside Lambey saw Cruz heading

in his direction, and someone with him was trying to restrain Cruz, talk to him.  Lambey

asked him, "What's up my nigga," meaning what was Cruz's problem. (*Id*. at 179.)  Cruz

said, "fuck you, my boy." (*Id*.)  Serano was walking towards Cruz and said, "Fuck you,

Cruz." (*Id*. at 180.)  Cruz swung at her; he didn't hit her the first time, but he connected

with the second swing, and she was knocked back sitting on the ground.  Lambey and

Cruz started fist-fighting.  Lambey knocked Cruz to the ground; Cruz got up and ran.

Someone drove up in a blue BMW or Mercedes Benz that Lambey had previously seen

Cruz driving.  Lambey heard a first shot.  Lambey yelled, "Motherfucker, you're

shooting," and threw two bottles toward the car.  The car drove around the parking lot,

came back, and Lambey clearly saw Cruz in the driver's seat with a gun.  He

recognized the person in the passenger seat and later learned his name was Eric

Hernandez.  Cruz and Lambey made eye contact, then Cruz shot twice.  After the

second round of gunfire, Lambey saw Serano fall to the ground.  She'd been hit in the chest; Lambey tried to put his thumb in her chest to stop the bleeding, but blood started coming out of her eyes, mouth, and nose.  Lambey never saw anyone else with a weapon that night.

Felix Martinez testified that Serano was his niece.[5] (Exh. 52 at 6-121.)  He agreed that he loved Serano like a daughter, that Lambey also lived with him and was like a son to him, and that Rasheda Lopez and Monique Moreira were like nieces to him. He'd known and been friendly with the Cruz family all his life, though before Serano's death there had been some "friction" between Cruz's aunt and Serano, related to the fact that Cruz's aunt and Serano's boyfriend Lambey shared a child. (*Id*. at 15-16.)  On the night in question, Felix was at the club with a group including Lambey, Serano, and Castillo.  At some point, Felix followed Lambey and Serano outside.  Cruz and about five guys came outside.  Cruz was swearing at them, and several people including Cruz, Serano, and Lambey, started pushing each other.  Cruz then hit Serano with an open hand in the face.  Lambey said, "Oh, man, you hit my girl. Why you did that? Why you hit my girl?" (*Id*. at 27.)  Lambey then punched Cruz with a closed fist, who fell to the ground.  Cruz got up and said, "Well, I'm sick and tired of you-all motherfuckers trying to punk me, but, you know, I got something for you all." (*Id*. at 28.)  Cruz ran off in the direction of an adjacent Starbucks parking lot.  Felix and his group were in the well-lit Famous Dave's parking lot.  About 15-20 minutes later, Cruz drove up in his car—a Mercedes or BMW—and stopped.  Someone Felix recognized was in the passenger

---

[5] Felix also testified that Serano was known as "Dena" and also "Deanna." (Exh. 52 at 18-19.) He referred to her as Deanna in his testimony, but the Court will refer to her as Dena or Serano throughout the order to avoid confusion.

seat; others later told him the person's name was Eric Hernandez.  Felix could clearly

see Cruz had a gun, perhaps a chrome 9mm automatic or semi-automatic.  He fired two

shots in the air; the group ducked.  Then, Cruz drove close to Felix and fired three more

shots "into the crowd" from about ten feet away. (*Id.* at 30.)  After the gunshots Felix

saw Serano on the ground bleeding from her eyes, ears, and mouth.  People came to

her aid, but Felix thought she was already dead.  He saw that Lopez was bleeding from

the shoulder; she didn't yet realize she'd been shot.  He estimated about 20 people

witnessed the incident; many quickly fled the scene.  He testified that he was certain

that it was Cruz who pulled the trigger.  Several others who socialized with Serano and

Lambey testified similarly to Lopez, Lambey and Felix Martinez that they witnessed

Cruz strike Serano hard, Cruz and Lambey fist-fighting, then Cruz driving over and firing

on the group several times, killing Serano and injuring Lopez.[6]

The State subpoenaed Eric Flores to testify. (Exh. 55 at 323-354, Exh. 56 at 14-

112.)  He said that Serano and Cruz are both his cousins, but he had a closer

relationship with Cruz.  That night Flores went outside the club and saw Cruz talking to

an older man.  He asked Cruz if everything was ok because it seemed perhaps

confrontational.  He asked Cruz if he was carrying a gun, Cruz said no.  Flores said that

Cruz sometimes had a gun when he was at a party.  Flores did not see a fight, but he

and Cruz went to Cruz's car; Cruz was upset.  Other people were coming up to the car,

egging Cruz on to fight with Lambey.  Cruz said that Lambey was "punking him" in front

of everyone. (Exh. 56 at 17.)  Flores tried to calm Cruz down; Cruz said he was going

---

[6] *See, e.g.,* testimony of: Keyanna Martinez (Exh. 51 at 152-167); Ricky Miranda (Exh. 54 at 27-66); Keith Martinez (Exh. 54 at 67-96); Greeka Martinez (Exh. 54 at 160-224, Exh. 55 at 9-59); Desmond Castillo (Exh. 55 at 121-185.); and Sherilyn Monique Moreira (Exh. 55 at 237-322).

home and drove off.  Flores thought that Eric Hernandez and another individual were in the car with Cruz when he drove away.  Flores walked towards his own car; not even a minute later he heard gunshots.  Flores turned around and saw only a crowd of people. He got in his car and drove home.  Flores saw Cruz at Cruz's cousin Clement's house the next morning.  Cruz was nervous because he heard his name all over the news.

Flores testified at trial that Cruz never said he had a gun.  Prosecutors questioned him at length about the statement he gave to police that night.  Flores acknowledged that he told police at the time that Cruz pulled a gun out from under the car seat, cocked it and said, "Man, I'm fixing to kill this nigga." (*Id*. at 38.)  He agreed that when he was arrested on unrelated robbery charges, he told police that he had some information on the murder at the Geisha House.  The officer told him that he would have to confirm Flores' information was truthful before he tried to work anything out with the district attorney with respect to Flores' arrest.  Flores testified that Cruz told him where Cruz had disposed of the gun in the desert, and Flores retrieved the gun and later sold it. Cruz had told Flores that he wanted to go to Mexico.

Flores acknowledged that he told police that he saw Cruz get out of his car and shoot Serano.  Flores said at trial that most of what he told police was false and that he was just trying to get favorable treatment in his case.  Flores agreed that he had asked to speak to the homicide detectives, was read his Miranda rights, and willingly spoke to them.  When the court read a juror's question asking Flores why he made false statements to police that were damning to his friend's case, Flores responded, "[there] was a bunch of fingers pointed at him anyway, one more wouldn't make too much of a

difference." (*Id*. at 107.)  He also reiterated that he found the gun in the desert because Cruz gave him directions to locate it.

A Geisha House chef testified that he was actually working as security on the night in question. (Exh. 52 at 121-150.)  He went out to the well-lit Famous Dave's parking lot and saw a fight.  One group from the fight tried to re-enter the club but another security guard told them they couldn't go back in.  The security guard watched the group head to the Starbucks parking lot, which was also well-lit.  He saw one of the guys pull out a gun and get into a dark 4-door sedan, maybe a BMW—he could not recall whether the guy got in the driver's or passenger's side—and drive off toward Famous Dave's.  The guard heard shots fired and saw the smoke.

A second security guard testified that earlier in the evening he had patted down Cruz at the club entrance, and he didn't have a weapon. (Exh. 55 at 60-120.)  The guard later saw Cruz and Lambey fighting outside; Lambey knocked Cruz to the ground.  The security guard denied Cruz re-entry to the club.  The guard saw Cruz walk to a dark blue 4-door car, open the passenger side door, and retrieve something.  Cruz walked back toward the club wearing a holster with a silver and black gun in it.  The gun appeared to be larger than a handgun.  Cruz went back to the car; the car drove over to the Famous Dave's parking lot.  The guard heard four gunshots; he went into the club and called police.  He never saw anyone else with a gun.

Petitioner Carim Cruz testified. (Exh. 57 at 185-220, Exh. 58 at 9-176.)  He said he'd always gotten bad vibes from Lambey and stayed away from him.[7]  Lambey would

---

[7] Several witnesses testified that Lambey and Cruz had not gotten along in the past. *See, e.g.*, testimony of: Rasheda Lopez (Exh. 51 at 100-135); Felix Martinez (Exh. 52 at 49-92); Greeka Martinez (Exh. 54 at 160-224); and Eric Flores (Exh. 55 at 329).

threaten Cruz, including death threats, on Facebook so Cruz blocked him.  Cruz said that he was an event promoter with a group known as the Belizean Kings.  Prior to the night at the Geisha House, he was promoting a show at a club when Lambey showed up.  Lambey was angry and yelling about an altercation that Cruz's cousin had started at a party Lambey was hosting.  Cruz didn't know anything about it, but he apologized and offered to pay for any damage.  A lot of the Belizean Kings were upset that Lambey was constantly disrespectful towards them.

The Geisha House event was a big one for the Kings.  Cruz arrived around midnight and helped his cousin Denton Figueroa—the DJ—set up; he started playing around 12:30.  Lambey showed up and was yelling at Cruz and his group from the dance floor.  Cruz couldn't make out what he was saying.  He finally pointed Lambey and Serano out to security who escorted them out.  After Figueroa finished playing, he went outside.  Cruz went out to check on him and saw him arguing with Lambey.  Cruz told his friends who were outside that everyone was making a scene, and they should all go back inside.  He was heading inside when a friend stopped him.  Eric Flores and others asked him if everything was alright.  Cruz said "Yeah. I'm good, I'm good, he's good." (*Id*. at 15.)  Lambey and Serano left their car and approached Cruz.  Lambey asked a friend of Cruz's who was standing there, "Does this bitch ass nigger have a problem?" (*Id*. at 16.)  Cruz asked Lambey why he always came to Belizean Kings events if he had a problem with Cruz or the Kings.  Cruz told Lambey to stop trying to punk him because he wasn't scared of Lambey.  Cruz and Serano and Lambey were yelling loudly at each other.  Cruz leaned forward to push Lambey; Lambey moved out of the way and Cruz unintentionally hit Serano who fell backwards to sitting.  Lambey started yelling that

Cruz had hit his girl.  Lambey swung and punched Cruz, and he fell backwards to the ground.  When Cruz got to his feet, he saw that Lambey had Eric Hernandez on the ground.  Cruz's cousin, John, pulled Lambey off of Eric.  Cruz and Eric Hernandez and others headed back toward the club.

The security officer told them they couldn't come back in and that the club was closing because of the altercation.  Eric Hernandez and Cruz's friends AJ and Raheem began walking towards Cruz's car, which had dark tinted windows. They leaned against the trunk, discussing what had transpired.  Eric Hernandez walked off after a bit.  Cruz unlocked his car and retrieved his cell phone.  Cruz told his friends he was going home. Eric Hernandez came back to the car and asked for a ride for himself and a friend.  He started explaining the directions and Cruz said why don't you just drive.  As they started driving Cruz was looking at his phone; he heard a crash that turned out to be a bottle striking the car.  He looked up and Hernandez had pulled out a gun.  Hernandez fired a couple of shots and then drove on.  He only stopped and fired the gun that one time. Cruz started telling him to pull over.  He eventually got Hernandez to pull over.  They switched seats and Cruz drove home.  He didn't know then that anyone had been hit. Cruz's brother, Anthony, called him crying and told him that Serano had been hit and everybody thought that Cruz shot her.  Anthony told Cruz to meet him at their mother's house.  He stayed there overnight; the car was in the driveway.  Earlier a San Bernadino Sheriff's detective had testified that Cruz's car, which was wanted in Las Vegas, was discovered in Victorville, California on August 25, 2014. (Exh. 54 at 97-108.)  Cruz testified that he didn't know how his car came to be in California, two miles off a freeway.  He denied moving around to different houses after the shooting; he said

he stayed at his brother Anthony's house.  On cross-examination Cruz acknowledged that he called an attorney but never called the police.  He said he did not call Serano's family because they were sending him threats.

## IV.  Analysis

### a.  Grounds 2 and 3

Cruz alleges in ground 2 that trial counsel was ineffective for failing to conduct a pretrial investigation that would have uncovered photographs[8] that the State introduced (2(i)) and for failing to properly object to the photos as impermissible extrinsic evidence related to a collateral matter (2(ii)(a)) and as impermissible prior bad acts evidence (2(ii)(b)). (ECF No. 18 at 13-18.)[9]  In ground 3, Cruz contends that his trial counsel was ineffective for failing to properly object to Monique Moreira's testimony that she once saw Cruz with a gun. (*Id*. at 18-20.)

The State introduced two photos at trial after Cruz testified on cross-examination that he did not carry a gun, had not owned a gun in many years, and did not own a gun at the time of the shooting. (*See* Exh. 58 at 170.)  Cruz explained on the stand that the two photos were from a shoot for a music video in about 2013; Cruz and others are depicted in both photos holding guns.  He testified that the guns were fake, just props for the video, and pointed out the person in the photo holding a video camera.  The State then re-called Monique Moreira, who testified that she had seen Cruz at her

---

[8] The Petition includes a copy of the photographs. (ECF No. 18 at 14-15.)

[9] The Court clarified in the Order on the Motion to Dismiss that ground two would be divided into these subparts. (ECF No. 35 at 8, n.2.)

house with a briefcase containing a gun in 2010. (*Id.* at 177-186.)  Defense recalled

Cruz, who denied ever taking a gun to the house in 2010. (*Id.* at 187-188.)

The Nevada Court of Appeals rejected these claims:

First, Cruz claimed trial counsel was ineffective for failing to object to the admission of evidence of Cruz's history of gun possession on the grounds that it constituted improper extrinsic evidence used to impeach on a collateral matter. Generally "[i]t is error to allow the State to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter." *Jezdik v. State*, 110 P.3d 1058, 1063 (Nev. 2005). However, the State may introduce extrinsic evidence "to show a specific contradiction with the adversary's proffered testimony" where the evidence "squarely contradict[s] the adverse testimony." *Id.* at 1065. The testimony of a witness used for the purpose of contradicting the defendant's testimony is "clearly distinguishable from the use of specific acts of misconduct to impeach the accused's character or credibility." *Bostic v. State*, 760 P.2d 1241, 1244 (Nev. 1988).

During its case in chief, the defense called two witnesses who both testified they had never seen Cruz with a gun. Cruz then took the stand and testified that he does not carry a gun and had not had a gun for a number of years. Thereafter, the State introduced into evidence images from Cruz's social media page depicting him with guns during the time period when Cruz claimed he did not possess one. The State later called a rebuttal witness who testified that she saw Cruz carry a briefcase with a gun in it during the time period when Cruz claimed he did not have a gun. This extrinsic evidence squarely contradicted evidence presented during the defense's case regarding Cruz's lack of history of gun possession. Moreover, the Nevada Supreme Court determined on direct appeal that overwhelming evidence supported Cruz's guilt. *See Cruz v. State*, Docket No. 71431 (Order of Affirmance, September 28, 2018). Accordingly, Cruz failed to demonstrate counsel's performance fell below an objective standard of reasonableness or a reasonable probability of a different outcome had counsel objected to the evidence as constituting improper extrinsic evidence used to impeach on a collateral matter. . . .

......

. . . . Cruz claimed counsel was ineffective for failing to conduct an adequate investigation. Specifically, Cruz argued that, had counsel filed a pretrial motion for discovery, Cruz would have received the social media images of him and allowed him to prepare for their impact on his trial. Cruz's bare claim failed to explain how counsel was ineffective for failing to discover images Cruz himself possessed. And overwhelming evidence supported Cruz's guilt. Accordingly, Cruz failed to demonstrate counsel's performance fell below an objective standard of reasonableness or a

reasonable probability of a different outcome had counsel conducted an investigation to Cruz's satisfaction. . . .

. . . . Cruz claimed trial counsel was ineffective for failing to object to the admission of evidence of Cruz's history of gun possession on the grounds that it constituted prior-bad-act evidence. Cruz's bare claim failed to explain how the challenged evidence was of a bad act. And overwhelming evidence supported Cruz's guilt. Accordingly, Cruz failed to demonstrate counsel's performance fell below an objective standard of reasonableness or a reasonable probability of a different outcome had counsel objected that the challenged evidence amounted to prior-bad-act evidence. Therefore, we conclude the district court did not err by denying [these claims] without conducting an evidentiary hearing.

(Exh. 156 at 4-6.)

This Court agrees that Cruz has not shown deficiency or prejudice.  He does not explain how the inculpatory rebuttal evidence would have been subject to discovery nor why he did not advise his counsel about his photo shoot with guns on social media.  He also does not explain what counsel would have done differently if he had located the photos before trial.  They were not necessarily incriminating; Cruz testified that they were prop guns for a music video and pointed out that one person in the photo was holding a video camera.  The Court also notes that one person in the photo was brandishing a sword—not a weapon commonly used or possessed—which tends to lend credence to Cruz's explanation of the video shoot.  Cruz specifically testified that he had not owned a gun in many years, so the State rebutted that specific testimony with a witness who said she had seen Cruz carrying a briefcase with a gun about four years before the shooting.  Overwhelming evidence supported his conviction.  Cruz has failed to demonstrate that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d).  The Court denies the entirety of ground 2 as well as ground 3.

**b. Ground 4**

Cruz asserts that his trial counsel failed to object to bad act evidence offered by Eric Flores. (ECF No. 18 at 20-21.)  Flores first responded to State questioning by saying that Cruz did not get a new gun after the shooting. (ECF No. at 39.)  Then he agreed that he had told police that Cruz's brother, Anthony, gave Cruz another gun after the shooting. (*Id.* at 40.)  Under NRS 48.045(2), "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."

The Nevada Court of Appeals held that this was a bare, unsupported claim:

> . . . . Cruz claimed counsel was ineffective for failing to object to a witness's testimony that Cruz's brother gave Cruz another gun after the shooting. Cruz argued the testimony lacked foundation and amounted to prior-bad-act evidence. Cruz's bare claim failed to explain how the testimony lacked foundation or described a bad act. And overwhelming evidence supported Cruz's guilt. Accordingly, Cruz failed to demonstrate counsel's performance fell below an objective standard of reasonableness or a reasonable probability of a different outcome had counsel objected that the challenged testimony lacked foundation and amounted to prior-bad-act evidence. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

(Exh. 156 at 6-7.)

Flores was an unwilling witness under subpoena.  His testimony was damaging at times, but also was equivocal and confusing throughout.  Flores denied that Cruz got a new gun after the shooting, but agreed he told police that Cruz got another gun. (Exh. 56 at 39-40.)  It's unclear whether this is even a prior bad act or a bad act.  Cruz argues here that "Flores' testimony put a gun in Cruz's hands and made it easier for the jury to see Cruz as the shooter." (ECF No. 18 at 21.)  But Flores had already acknowledged that he had also told police that Cruz pulled a gun out of his car, that he said he was

going to kill someone, and that he saw Cruz shoot Serano.  Numerous eyewitnesses testified that they were close by and clearly saw Cruz fire a gun out of his car and shoot and kill Serano and shoot Lopez.  Cruz has not explained how counsel was deficient and he cannot show he was prejudiced by failing to object to equivocal testimony that Cruz's brother gave him another gun after the shooting.  Cruz has failed to demonstrate that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d).  Habeas relief is therefore denied as to ground 4.

### c.  Ground 5

Cruz contends that trial counsel ineffectively failed to object to a general intent jury instruction because murder is a specific intent crime. (ECF No. 18 at 21-23.)  He points to *Ford v. State*, 262 P.3d 1123, 1134 (Nev. 2011).  There the Nevada Supreme Court reversed and remanded the defendant's conviction because he was charged with a specific intent crime, but the jury only received a general intent instruction.

Here, the trial court gave this instruction on general intent:

> To constitute the crimes charged, there must exist a union or joint operation of an act forbidden by law and an intent to do the act.

> The intent with which an act is done is shown by the facts and circumstances surrounding the case.

> Do not confuse intent with motive. Motive is what prompts a person to act. Intent refers only to the state of mind with which the act is done.

> Motive is not an element of the crime charged and the State is not required to prove a motive on the part of the Defendant in order to convict. However, you may consider evidence of motive or lack of motive as a circumstance in the case.

(Exh. 60 at 31, instruction no. 28.)

1        The court also gave instructions on specific intent. (*Id*. at instruction nos. 6, 7, 8,

2   11.)

3        The Nevada Court of Appeals disagreed that defense counsel ineffectively failed

4   to object to the general intent instruction:

> . . . . Cruz claimed counsel was ineffective for failing to object to a
> jury instruction on general intent. Cruz claimed the instruction was
> misleading in light of his being charged with specific-intent murder. Cruz
> was charged with battery with the use of a deadly weapon, which is a
> general intent crime. *Byars v. State*, 130 Nev. 848, 863, 336 P.3d 939,
> 949 (2014). Therefore the district court properly instructed the jury
> regarding general intent. *See Rossana v. State,* 113 Nev. 375, 382, 934
> P.2d 1045, 1.049 (1997) (requiring juries be instructed on "the basic
> elements of the offense charged"); *see also* NRS 193.190 (providing that
> "[i]n every crime or public offense there must exist a union, or joint
> operation of act and intention"). Accordingly, Cruz failed to demonstrate
> counsel's performance fell below an objective standard of reasonableness
> or a reasonable probability of a different outcome had counsel challenged
> the general intent jury instruction. Therefore, we conclude the district court
> did not err by denying this claim without conducting an evidentiary
> hearing.
>
> (Exh. 156 at 9.)

15        The Court finds this claim to be without  merit.  Count 4 charged Cruz with

16   Battery with Use of a Deadly Weapon for shooting Rasheda Lopez, a general

17   intent crime. (*See* Exh. 60 at 5.)  Thus, the trial court did nothing improper by

18   instructing the jury on general intent. The jury was instructed on both general and

19   specific intent.  Cruz cannot demonstrate that the Nevada Court of Appeals'

20   decision was contrary to or involved an unreasonable application of *Strickland*.

21   28 U.S.C. § 2254(d).  Habeas relief is thus denied as to ground 5.

**d.  Ground 8**

Cruz asserts that his appellate counsel was ineffective for failing to raise the argument that the trial court should have instructed the jury that the court would sentence Cruz on the deadly weapon enhancement. (ECF No. 18 at 25-26.)  He argues that the jury may have imposed a more serious sentence based on their belief that they were determining the penalty not only for the underlying crime but also for the weapon enhancement.

Appellate counsel must "examine the record with a view to selecting the most promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752 (1983).  Although "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  Appellate counsel cannot be found to be ineffective for failure to raise an issue that lacks merit. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

At the start of the penalty phase, defense counsel asked that the jury be instructed that it was deciding Cruz's sentence on the First-degree Murder conviction, but that the trial judge would determine Cruz's sentence on the deadly weapon enhancement. (Exh. 64 at 10-12.)  After argument and witnesses, before the jury was given its instructions, defense counsel submitted a proposed instruction to the court. (*Id.* at 176-178.)  The court rejected the instruction, reasoning that the statute clearly states that the deadly weapon enhancement is set by the judge and seeing no reason to inform the jury of that fact.  Arguing that appellate counsel should have raised the claim that the trial court erred by not giving the proposed instruction, Cruz relies on

*Menendez-Cordero*, 445 P.3d 1235, 1243 (Nev. 2019).  In that case, the trial court had in fact informed the jury that the court would determine the sentence for the deadly weapon enhancement at a later date.  Menendez-Cordero argued on appeal that the district court erred in not giving the proposed defense instruction that included more detail on the practical effect of a deadly weapon enhancement.  Rejecting that argument, the Nevada Supreme Court held that the trial court may, but is not required to, inform a jury that is imposing a sentence in a first-degree murder case about the effects of a deadly weapon enhancement. (*Id*. at 1243.)

The Nevada Court of Appeals concluded that Cruz's claim that appellate counsel was ineffective lacked merit:

> The imposition of a sentencing enhancement falls outside the province of the jury. *Menendez-Cordero v. State*, 135 Nev. 218, 228, 445 P.3d 1235, 1243 (2019). And even though the trial court in *Menendez-Cordero* explained to the jury that the court would determine the sentence for the deadly weapon enhancement, nothing in the *Menendez-Cordero* decision suggests the trial court was required to do so. Accordingly, Cruz failed to demonstrate counsel's performance fell below an objective standard of reasonableness or a reasonable probability of success had counsel raised the issue on appeal.

(Exh. 156 at 11-12.)

Appellate counsel was not required to raise a meritless claim. Cruz cannot demonstrate that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d).  Habeas relief is thus denied as to ground 8.

### e.  Procedurally Defaulted Claims – Grounds 1 and 6

Cruz acknowledges that the ineffective assistance of trial counsel claims in grounds 1 and 6 are procedurally defaulted. (ECF No. 39 at 10-18, 35-37.)  He insists

1  he can show good cause and actual prejudice to overcome the default of these claims

2  under *Martinez v. Ryan,* 566 U.S. 1 (2012). To establish cause under *Martinez*, a

3  petitioner needs to show "that he had no counsel during his state collateral review

4  proceeding or that his counsel during that proceeding was ineffective under the

5  standards of *Strickland v. Washington*." *Rodney v. Filson*, 916 F.3d 1254, 1259 (9th Cir.

6  2019); *see also Martinez*, 566 U.S. at 14.  Cruz also needs to establish prejudice. He

7  can satisfy the prejudice standard by showing his defaulted claims are "substantial," that

8  is that they have "some merit." *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013).

9      **Ground 1**

10      Cruz claims that trial counsel ineffectively presented a defense of

11  misidentification instead of a defense that his actions rose only to voluntary

12  manslaughter. (ECF No. 18 at 8-13.)  The defense presented the theory that Eric

13  Hernandez was in the driver's seat and was the shooter and that Cruz was in the

14  passenger seat.  Cruz argues that trial counsel's strategy was objectively unreasonable

15  because a viable alternative was available. (ECF No. 18 at 8.)  The jury was instructed:

16          Deliberation is the process of determining upon a course of action
        to kill as a result of thought, including weighing the reasons for and
17      against the action and considering the consequences of the actions.

18          A deliberate determination may be arrived at in a short period of
        time. But in all cases the determination must not be formed in passion, or
19      if formed in passion, it must be carried out after there has been time for
        the passion to subside and deliberation to occur. A mere unconsidered
20      and rash impulse is not deliberate, even though it includes the intent to
        kill.

21      (Exh. 60, jury instruction no. 8.)

22      Cruz asserts that defense counsel could have argued that several events

23  negated the deliberation element of First-degree Murder and/or established elements of

25

Voluntary Manslaughter: (1) Lambey constantly antagonized and demeaned Cruz and his friends; (2) Cruz's cousin had recently started a fight at Lambey's house; (3) Lambey knocked Cruz to the ground in a fistfight shortly before the shooting; and (4) Lambey threw glass bottles at Cruz's car. (ECF No. 39 at 11.)

Counsel's strategic decisions are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Cruz testified at trial that Eric Hernandez was driving Cruz's car and was the shooter. Cruz does not claim that he wanted his attorney to concede that he shot the victims. Neither does Cruz claim that he disagreed at the time with his trial counsel's decision to pursue a misidentification defense at trial. Even if the defense had presented the theory that Cruz's actions did not rise to first-degree murder, the evidence at trial supported the conclusion that Cruz did not act out of a mere unconsidered and rash impulse. The evidence showed that after Cruz and Lambey had a fist-fight, Cruz walked away and went to his car. Ten to fifteen minutes later he started the car, drove over to where Lambey and Serano and others were standing, raised his gun out of the driver's window, and fired about 2 shots into the crowd. He then drove around again and fired about 3 more shots. There is simply not a reasonable probability that the trial results would have been different if the defense had presented a theory based on lack of *mens rea* for First-degree Murder. Cruz has not demonstrated that this claim is substantial. He has not established good cause and prejudice to overcome the procedural default of ground 1. The Court, therefore, dismisses ground 1 as procedurally barred from federal habeas review.

1        **Ground 6**

2        Cruz claims that trial counsel was ineffective regarding plea proceedings

3    because his counsel told Cruz that the most serious crime he could be convicted of at

4    trial was Second-degree Murder. (ECF No. 18 at 23-24.)  In the context of a declined

5    plea offer, the defendant/petitioner must establish that but for the erroneous advice, the

6    defendant would have accepted the plea. *Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

7        At trial, the parties informed the court that plea negotiations had been

8    unsuccessful. (Exh. 50 at 34-35.)  The State originally offered second-degree murder

9    with use of a deadly weapon, which Cruz rejected.  The State then offered second-

10    degree murder and battery with deadly weapon causing substantial bodily harm.

11    Defense counsel conveyed the offer, which Cruz also rejected.

12        This claim was never raised in state court, and therefore, Cruz never sought an

13    evidentiary hearing to develop these allegations. (*See* Exh. 151.)  This Court notes that

14    § 2254(d)(1) "requires an examination of the state-court decision at the time it was

15    made and on the same record." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).  The

16    Supreme Court explained in *Shinn v. Ramirez* that "under § 2254(e)(2), a federal

17    habeas court may not conduct an evidentiary hearing or otherwise consider evidence

18    beyond the state-court record based on ineffective assistance of state postconviction

19    counsel." 596 U.S. 366, 387 (2022).  Section 2254(e)(2) provides that, if a prisoner "has

20    failed to develop the factual basis of a claim in State court proceedings," a federal court

21    may hold "an evidentiary hearing on the claim" in only two circumstances, neither of

22    which apply to in this case.[10]

23    _____

[10] The two circumstances are (1) when the claim relies on a "new" and "previously unavailable"
"rule of constitutional law" made retroactively applicable by this the Supreme Court or (2) when

Ground 6 is a wholly unsupported, bare claim.  Cruz presents no evidence that his postconviction counsel was even aware of Cruz's allegation—presented for the first time in his federal petition—that trial counsel told him that the most serious crime he could be convicted of at trial was second-degree murder.  No testimony, affidavit or declaration supports this allegation.  Cruz has not demonstrated that this claim is substantial. He has not established good cause and prejudice to overcome the procedural default of ground 6.  Accordingly, the court dismisses ground 6 as procedurally barred from federal review.

### f.  Cumulative Error – Ground 7

Cruz argues that the cumulative effect of the trial errors violate his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 18 at 24.)  The Nevada Court of Appeals concluded that Cruz failed to show he was prejudiced by any combination of alleged deficiencies. (Exh. 156 at 12-13.)  This court agrees that Cruz has not demonstrated any errors to cumulate.  Cruz has not shown that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d).  Ground 7 is denied.

### V. Certificate of Appealability

This is a final order adverse to the Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v.*

---

the claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii).

*Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Having reviewed its determinations and rulings in adjudicating Cruz's petition, the court finds that none of those rulings meets the *Slack* standard. The Court therefore declines to issue a certificate of appealability for its resolution of Cruz's Petition.

## VI.    Conclusion

It is therefore ordered that the First Amended Petition (ECF No. 18) is **DENIED**.

It is further ordered that a Certificate of Appealability will not issue.

The Clerk of the Court is directed to:

- substitute Ronald Oliver for Respondent William Hutching;

- enter Judgment accordingly and close this case.


DATED: 15 April 2024.

GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE